UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JACOB C. BRIER, Plaintiff, | ) | |
| v. | ) | No. 1:24-cv-00092-JRO-KMB |
| AKILAH LAMAR, et al., Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Jacob C. Brier alleges in this case that he was denied mental health treatment and was denied recreation and sanitary conditions of confinement when he was incarcerated at Pendleton Correctional Facility ("Pendleton"). He sues Warden Dennis Reagle, Unit Team Manager Joshua Shaver, and Lt. Jonathan Jackson (the "State Defendants"), and mental health providers Dr. Akilah Lamar and Dr. Kelly McCafferty (the "Medical Defendants"). The Medical Defendants have moved for summary judgment, dkt. [78], as well as the State Defendants, dkt. [84]. For the reasons below, their motions for summary judgment, dkt. [84], dkt. [78], are **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to

the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Brier and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572.

### A. The Parties

Brier, who is incarcerated by the Indiana Department of Correction ("IDOC"), was housed at Pendleton during the relevant time. Dkt. 84-1 at 15. He was held in G Cell House, a Restrictive Status Housing Unit ("RSH"), also known as segregation, from March 18, 2023 until February 27, 2024. Dkt. 84-4.

Dennis Reagle was the Warden at Pendleton until January of 2024. Dkt. 84-18 ¶ 2. Joshua Shaver was a Unit Team Manager. Dkt. 84-19 ¶ 3. Jonathan Jackson was a Correctional Lieutenant. Dkt. 86-1 ¶ 1.

Defendant Dr. Akilah LaMar is a licensed psychologist and has a Psy.D in psychology. Dkt. 78-1 ¶ 2. She was licensed to practice psychology in Indiana from 2020 to August 2024. *Id.* In 2023, Dr. LaMar worked at Pendleton as a psychologist. *Id.* ¶ 3. Defendant Dr. Kelly McCafferty is also a licensed psychologist with a Psy.D in psychology. Dkt. 78-2 ¶ 2. Dr. McCafferty has worked as a psychologist at Pendleton since 2023. *Id.* ¶ 3. As psychologists at the prison, Dr. LaMar and Dr. McCafferty provided individual therapy to patients and oversaw other mental health staff, which included Behavioral Health Specialists and Mental Health Professionals. Dkt. 78-1 ¶ 3; dkt. 78-2 ¶ 3. They also reviewed documentation of the mental health staff regarding patients and they frequently discussed patients. Dkt. 78-1 ¶ 3; Dkt. 78-2 ¶ 3. The psychiatrist or psychiatric nurse practitioner, and not Dr. LaMar or Dr. McCafferty, prescribes psychiatric medication. Dkt. 78-1 ¶ 3; Dkt. 78-2 ¶ 3.

**B. Brier's Placement in Segregation**

On March 18, 2023, Brier threw liquid from a hotpot on custody staff and, after the staff member drew his O.C. spray and ordered Brier to be restrained, Brier tried to throw more hot liquid on custody staff. Dkt. 84-18 ¶ 16. Because of this assault, Brier was found guilty of conduct violations A117 and A123. Dkt. 84-5 at 19. Brier lost 45 days of commissary privileges and 180 days of earned credit time. *Id.* He was also given 365 days in RSH. *Id.*

At this time, Brier had a serious mental illness ("SMI") designation. Dkt. 78-2 ¶ 4. Generally, inmates with SMI designations are not placed in RSH, with some exception, such as protective custody or a danger exception. Dkt. 84-18 ¶ 13. Further, without such an exception, an inmate with an SMI designation should not stay in RSH for longer than 30 days. *Id.* ¶ 22. A prisoner is given the "danger exception" when he has engaged in misconduct that shows that he is a danger to staff or inmates. *Id.* ¶ 15. When custody staff places an inmate with an SMI designation in disciplinary segregation, the mental health staff must follow Indiana Healthcare Services Directive 4.03A, which requires that, with rare exceptions, seriously mentally ill individuals may not be housed there for more than 30 days. *Id.* ¶ 22.

### C. Brier's Mental Health Care from March 18, 2023, through February 28, 2024

#### 1. Spring of 2023

On March 20, 2023, Brier submitted a Request for Healthcare ("RFHC") asking to be put on medication for his mental health needs. Dkt. 78-4 at 44.[1] Dr. LaMar received this Request and passed it along to the psychiatric nurse practitioner ("NP"), Lindsay Manning, who could prescribe psychiatric medication. Dkt. 78-1 ¶ 9. Brier then saw NP Manning a few days later and she prescribed Paroxetine (Paxil). *Id.*

Dr. LaMar conducted a Restrictive Housing Placement Review the next day. Dkt. 78-3 at 9–10. She reviewed his medical chart and noted that he was a seriously mentally ill offender with an active diagnosis of psychotic disorder and therefore he would be released from RHU in 30 days unless the prison staff applied a danger exception. *Id.* at 7. Dr. LaMar also met with him, and he reported that he was placed in RHU after an assault on staff and that he should not have been released from RHU the last time he was in it. *Id.* at 11. He reported that he did not want to go back to general population and asked about going to the IRT (the "residential treatment program") or NSP, which are residential treatment units for inmates with psychiatric disorders. *Id.* Dr. LaMar informed him that placement in one of those units was based on the person's individual

[1] The Medical Defendants are reminded that the Court's Order Setting Pretrial Schedule and Discussing Discovery in Prisoner Litigation provides: "References to exhibits submitted in support of the motion for summary judgment must not be to the BATES label, but should be to the page number (or paragraph number, as appropriate). Dkt. 51 at 4-5. Counsel must follow these directions in future filings.

mental health needs and she encouraged him to work with the mental health staff. *Id.* Brier did not report any immediate mental health concerns or any thoughts of self-harm or suicidal ideation. *Id.* Because he had a D mental health code and was considered seriously mentally ill, Dr. LaMar informed him that while in segregation, he would receive an out of cell therapy session every two weeks and would be seen twice weekly by mental health staff during their rounds. *Id.* Dr. LaMar did not observe anything about Brier during that visit that concerned her and she saw no reason why he could not continue in segregation despite his mental health status. *Id.*

Brier saw NP Manning on March 23, and she started him on Paxil. *Id.* at 13–18. A few days later, Brier submitted another RFHC stating that he had a lot going on his in head and going to J or H was not a good idea. Dkt. 78-4 at 45. Dr. LaMar assumed J or H referred to another housing unit at the prison. Dkt. 78-1 ¶ 11. She received this RFHC on March 30, 2023, and scheduled him to see mental health staff. *Id.*

Dr. McCafferty conducted an out-of-cell therapy session on March 30, 2023. Dkt. 78-3 at 19–20. Brier reported he was doing alright but was anxious about some family issues. *Id.* He had a tablet, which he reported was helping him stay occupied. *Id.* Dr. McCafferty did not note anything serious about Brier's mental health status or that he was mentally decompensating. *Id.* Behavioral Health Specialist Lindsay Shaw went to Brier's cell for a mental health visit that same day, and he reported being good and asked about going to the Recovery While Incarcerated ("RWI") program. Dkt. 78-4 at 43. Shaw saw him again on

April 7, and he reported he had no mental health concerns. *Id.* On April 10, Brier reported he was getting out of segregation on April 17 or 18 and that he wanted to go to RWI or the residential treatment program. *Id.* at 42. He did not report any mental health issues or concerns. *Id.*[2] Brier submitted a Classification Appeal on April 6, complaining that his current unit had no programs or mental health and asking to be transferred to Westville Correctional Facility. Dkt. 84-5 at 13.

Dr. McCafferty met Brier for out-of-cell therapy on April 13. Dkt. 78-3 at 21–22. He reported that he was being released from restrictive housing and expressed some worry about getting into trouble when he returned to his cellhouse. *Id.* He expressed his plan to participate in the RWI program and obtain his GED. *Id.* Dr. McCafferty attests that these forward-thinking expressions were positive and a good sign of Brier's mental health status. Dkt. 78-2 ¶ 11.

Shaw went to Brier's cell for his weekly mental health visit on April 17. Dkt. 78-4 at 42. He reported that this was his 30th day in segregation and asked if he was getting out. *Id.* Shaw noted she would check on that and let him know. *Id.* Brier submitted an RFHC that day asking for mental health staff to come speak with him. Dkt. 78-4 at 46. Dr. LaMar received this Request on April 19 and responded that he was scheduled for a follow-up appointment. *Id.* Also on April 17, the Indiana Department of Correction assigned a danger exception to support Brier remaining in restrictive housing. Dkt. 78-2 ¶ 12. That means that

[2] Also on April 10, Brier's Restrictive Housing review form indicated that he did not meet SMI criteria. Dkt. 84-5 at 11. But Brier appealed this conclusion and his April 24 Restrictive Housing review form indicated that he did meet the SMI criteria. *Id.* at 15.

even though he had an SMI designation, the IDOC determined that he was too dangerous to be let out of restrictive housing. *Id.* This was based on his former misconduct and a finding that Brier was a threat to security. *See* dkt. 84-5 at 15.

Shaw went to Brier's cell for a weekly mental health visit on April 19, and Brier reported he was good with no mental health concerns. Dkt. 78-4 at 42. NP Manning attempted to meet with Brier the next day, but he stated that he was sleeping and refused to get up for the appointment. Dkt. 78-3 at 23–24. NP Manning rescheduled the appointment. *Id.* Shaw went to Brier's cell for his mental health visits on April 21 and 25, and he reported he was good with no mental health concerns. Dkt. 78-4 at 42.

Brier had a DWRH review on April 24, which found that he did meet the SMI criteria but had received the danger exception on April 17. Dkt. 84-5 at 15. Brier submitted an RFHC dated April 26, stating that he could not be in restrictive housing for longer than 30 days due to his past suicide attempt and having suicidal thoughts. Dkt. 78-4 at 47; Dkt. 78-2 ¶ 36. Dr. McCafferty responded on May 11, noting that mental health staff would talk to him during his next out-of-cell therapy session. Dkt. 78-2 ¶ 36. Brier's danger exception was continued on May 1. Dkt. 84-5 at 19.

Shaw went to Brier's cell for a mental health visit on May 4, and Brier reported he was good with no mental health concerns. Dkt. 78-4 at 42. Brier also met with NP Manning that day and reported doing alright and that he was still depressed and anxious but was unable to elaborate on his symptoms. Dkt. 78-

3 at 25–26. He reported sleeping well, eating well, taking care of his hygiene, watching TV, using his tablet, and talking to others on his range. *Id.* She continued his medication. *Id.* Brier had a DWRH review on May 8, and he was maintained in segregation. *See* dkt. 84-5 at 17.

Shaw went to Brier's cell for his weekly mental health visit on May 10, and he stated he was good with no mental health concerns. Dkt. 78-4 at 42. Dr. McCafferty met with Brier for out-of-cell therapy the next day. Dkt. 78-3 at 28. He asked about being transferred to the residential treatment program and reported that he was trying to get his danger exception overturned. Dkt. 78-2 ¶ 13. He reported that his last drug use was 3 weeks ago. *Id.* He explained that he was high on meth when he committed a staff assault and that he was responding to a command hallucination. *Id.* Dr. McCafferty asked him about hearing voices and he reported hearing voices when he was not high, but only occasionally. *Id.* He also reported frequent paranoia. *Id.* Based on her professional judgment and her interaction with him, Dr. McCafferty thought that he was primarily trying to get moved to the residential treatment program to avoid serving his time in segregation. *Id.*

Shaw went to Brier's cell for a mental health visit on May 18, but he was not in his cell. Dkt. 78-4 at 42. Dr. McCafferty met with him a week later for therapy. Dkt. 78-3 at 30–31. He discussed his desire to go to the residential treatment program but Dr. McCafferty told him that he did not currently qualify for placement in the residential treatment program. Dkt. 78-2 ¶ 14. He reacted angrily and said he did not want to talk to her further. *Id.* Dr. McCafferty

therefore left and as she walked away, Brier yelled, "do I need to fuck one of y'all up to get out of here?" *Id.* Dr. McCafferty found Brier's judgment to be impaired, specifically his thought that the way to get transferred to a mental health unit was to assault staff. *Id.*

Shaw went to Brier's cell for mental health visits on May 26 and June 9, and Brier reported he was good with no mental health concerns. Dkt. 78-4 at 42. On June 15, Dr. McCafferty went to Brier's cell for therapy. Dkt. 78-3 at 32. Custody staff informed her that they were unable to pull Brier out of his cell for his session. *Id.* When she went to Brier's cell, he was sleeping and did not respond to his name being called. *Id.* Shaw went to Brier's cell for a mental health visit on June 16 and Brier reported he was good and had no mental health needs. Dkt. 78-4 at 42.

**2. Summer of 2023**

On June 26, Dr. LaMar stopped by Brier's cell for out-of-cell therapy, but he declined the visit. Dkt. 78-3 at 33. Shaw went to Brier's cell for his weekly mental health visit two days later, but he was not in his cell. Dkt. 78-4 at 33. Dr. McCafferty met with Brier the next day for therapy. Dkt. 78-3 at 40-41. He reported that he was doing "alright" and asked about receiving certificates for some of the mental health workbook packets he had completed. *Id.* He apologized for his behavior the last time she saw him and indicated he was just disappointed

that he was not going to the residential treatment program and that he struggled with his anger. *Id.*

Dr. McCafferty went to Brier's cell on July 13 for therapy, but he did not wake up for the appointment. *Id.* at 42–43. Dr. McCafferty met with Brier on July 27 for therapy and he reported that he signed papers two months ago to transfer to a different prison but he was waiting for the transfer. *Id.* at 50–51. He complained about his treatment in restrictive housing, specifically that the correctional officers did not respond to him when he called and that they did not walk the ranges. *Id.* He asked about getting certificates of completion for his completed mental health packets. *Id.* Dr. McCafferty notified NP Manning that Brier did not want to take his mental health medication anymore. *Id.* NP Manning noted that the Director of Nursing informed her that Brier had refused his Paxil for five of the last eight days and that per the psychologist, he no longer wanted the medication, so she discontinued the medication. *Id.* at 52.

Dr. McCafferty stopped by Brier's cell on August 3, during mental health rounds. Dkt. 78-4 at 41–42. She then met with him about a week later for therapy. Dkt. 78-3 at 57–58. He reported doing well with his mental health symptoms. *Id.*

Dr. McCafferty met with Brier on August 16, for an emergency referral because Brier had communicated through his tablet he was feeling suicidal. Dkt. 78-3 at 59–62. Dr. McCafferty went to his cell, and he had a sheet hanging over the window in his cell door. *Id.* at 61. She asked him to remove the sheet so she could see if he was okay, and he asked her if she wanted to see his dick. *Id.* Dr.

McCafferty responded that she did not, and Brief refused to remove the curtain or respond to her further. *Id.* Dr. McCafferty informed Brier that if she could not see for herself that he was physically okay, she would have to have an officer remove his sheet. *Id.* Brier did not respond, so Dr. McCafferty had an officer remove the sheet. *Id.* Brier swore at the officer and Dr. McCafferty, calling her a "bitch" and a "dick sucker." *Id.* Dr. McCafferty smelled burning paper from Brier's cell, so he may have been using substances or was intoxicated. *Id.* Because of Brier's anger and hostility toward Dr. McCafferty, it was impossible to have any sort of discussion with him. *Id.*

Mental Health Professional Luis Figueroa met with Brier at his cell for his weekly mental health visit the next day. Dkt. 78-4 at 41. Brier was laying down in his bed and denied any suicidal ideation. *Id.* Figueroa met with Brier at his cell again the next day. *Id.* Brier had no mental health concerns, denied suicidal ideation and asked about certificates for groups he had completed. *Id.* Figueroa said he would look into those. *Id.*

Behavioral Health Specialist Kaitlyn Lawson met with Brier at his cell for his weekly mental health visit on August 22. *Id.* She took his phone call list and gave it to his caseworker while another mental health worker spoke with him. *Id.* Lawson met with Brier again at his cell two days later. *Id.* Brier did not report any mental health concerns and stated he did not want to see mental health staff. *Id.* Lawson met with Brier at his cell again on August 28. *Id.* Brier denied mental health concerns and discussed the packets he had completed and turned into his counselor. *Id.* Lawson met with Brier again a few days later and he again

discussed frustration over not getting certificates of completion for 12-step packets. *Id.* The two discussed his feelings related to that, and Lawson then spoke to RWI staff about the certificates. *Id.*

### 3. Fall of 2023

Lawson met with Brier at his cell for his weekly mental health visit on September 7. Dkt. 78-4 at 40. Brier reported that he had no mental health concerns and they discussed his therapy packets and certificates of completion. *Id.* Dr. McCafferty attempted to meet with Brier that day for out-of-cell therapy, but he refused. Dkt. 78-3 at 63–64. Lawson met with Brier at his cell for his weekly mental health visit the next day and reported that he had no concerns and asked about his danger exception. Dkt. 78-4 at 40. Lawson noted she would speak with the head psychologist about that and gave him more chapters of the trauma workbook. *Id.* Lawson met with Brier at his cell for his weekly mental health visit on September 13, and he had no mental health concerns and they discussed his trauma workbook/packet. *Id.* Lawson met with Brier at his cell on September 15. *Id.* at 39-40. Brier reported no concerns and Ms. Lawson gave him more chapters of a therapy workbook to complete and told him he would get his certificate next time if he completed them. *Id.* Lawson met with him again at his cell on September 20. *Id.* at 39. Brier had no mental health concerns and Lawson gave him a trauma therapy workbook. *Id.*

Dr. McCafferty attempted to meet with Brier the next day for therapy, but officers said he was refusing the session. Dkt. 78-3 at 65–66. Dr. McCafferty then spoke with him, and Brier denied refusing the session. *Id.* Lawson met with

Brier at his cell for his weekly mental health visit on September 22. Dkt. 78-4 at 39. Brier had a sheet hanging over his door but denied any mental health needs or concerns. *Id.* Lawson met with Brier at his cell on September 27. *Id.* He again had a sheet hanging over his door and refused to move it because he reported he was trying to sleep. *Id.*

Lawson met with Brier at his cell for his weekly mental health visit on October 4, and Brier denied any mental health concerns. *Id.* Dr. McCafferty attempted to meet with Brier the next day for therapy, but he was sleeping and did not respond to her when called. Dkt. 78-3 at 67–68. Lawson met with Brier at his cell on October 6. Dkt. 78-4 at 39. He denied any mental health concerns and asked for a therapy packet to work on. *Id.* Dr. McCafferty met with Brier on October 19, for therapy. Dkt. 78-3 at 69-70. He reported that he was "sexually frustrated," and Dr. McCafferty informed him that this comment was inappropriate. Brier responded that he was "just talking shit." *Id.* Dr. McCafferty asked him if he had anything he wanted to discuss and he declined. *Id.* Lawson was supposed to meet with Brier at his cell that day, but he was in the shower. Dkt. 78-4 at 38. She stopped by his cell again later and Brier had a sheet over the door and denied any mental health needs or concerns. *Id.* at 39.

Behavioral Health Specialist Ashley Ball went to Brier's cell on October 23 for a mental health visit, but Brier did not wake up. *Id.* at 38. Lawson met with Brier at his cell a few days later and gave him the mental health packets/therapy workbooks he previously requested. *Id.* Ball also met with Brier that day and he

denied any mental health needs or concerns. *Id.* Ball met with Brier at his cell again on October 30 and he denied any mental health needs or concerns. *Id.*

Dr. McCafferty met with Brier on November 2 for therapy and he complained that he never got certificates of completion for his finished mental health workbook packets. Dkt. 78-3 at 72–73. In Dr. McCafferty's professional judgment, he did not seem to be presenting any current mental health symptoms and portrayed a demanding demeanor regarding his certificates. *Id.* Ball also stopped by Brier's cell that day, but he was fully covered under his blanket and did not wake up. Dkt. 78-4 at 38. Lawson met with Brier for mental health rounds on November 6. *Id.* She heard Brier yelling that she had a "big booty" as she walked down the hall. *Id.* Lawson asked if he was talking about her and he said, "maybe." *Id.* Brier then asked for more therapy packets and for certificates for packets he had already completed and denied any suicidal or homicidal ideation. *Id.* Ball met with him at his cell again a few days later and he denied any mental health needs or concerns. *Id.* at 37–38.

Brier submitted an RFHC dated November 15, stating that he was in a toxic environment and he was not getting pulled out for his biweekly sessions. *Id.* at 50. Dr. McCafferty responded to this RFHC on November 29, noting that mental health staff saw him on November 16 and that he was being offered out of cell therapy sessions every two weeks. *Id.* Ball met with Brier at his cell on November 15. Dkt. 78-4 at 37. Brier was asleep, but Ball could see him laying under his blanket. *Id.* Dr. McCafferty met with Brier the next day for therapy. Dkt. 78-3 at 75–76. He reported that he was doing "alright," that he had not

gotten any news on his potential transfer, and he complained about the food. *Id.* He presented as hyper with some fidgeting and rapid speech. *Id.* He appeared to be functioning well. *Id.* It was not clear to Dr. McCafferty why he was more hyper than usual, as he did not otherwise seem intoxicated, but given his past substance use, that could not be ruled out. *Id.*

Ball met with Brier at his cell on November 22. Dkt. 78-4 at 37. He had a sheet hanging over his cell door and reported no needs or concerns. *Id.* Brier submitted an RFHC the next day stating that his phone list being blocked made him suicidal and homicidal. Dkt. 78-4 at 51. Dr. McCafferty responded to the RFHC on November 29, noting that he was scheduled to see mental health staff. *Id.* Lawson had met with Brier for mental health rounds on November 24, and he reported no concerns. *Id.* at 37. She met with him again at his cell on November 27, and he denied any mental health needs or concerns. *Id.* Brier submitted an RFHC on November 29, stating that he believed that mental health staff was to review his segregation status and danger exception every 14 days. *Id.* at 52. Dr. McCafferty responded that she would review the situation. *Id.* Ball stopped by Brier's cell the next day, but his cell was empty. *Id.* at 37. Dr. McCafferty also attempted to meet with Brier that day, but he refused the appointment and said he was doing fine. Dkt. 78-3 at 77; Dkt. 78-4 at 1.

**4. Winter 2023 to 2024**

Ball met with Brier for mental health rounds on December 4, and he would not move the sheet hanging over his cell door, but he reported no concerns. Dkt. 78-4 at 37. She met with him again on December 6, and he reported no mental

health concerns. *Id.* On December 11, Dr. McCafferty tried to meet with Brier for his therapy session, but he refused the appointment. *Id.* at 2–4. She noted that he had a history of refusing his therapy appointments and not engaging with mental health staff, but his mental health symptoms appeared stable. *Id.* Ms. Ball met with him on December 20. Dkt. 78-4 at 36–37. Brier reported being very angry that Internal Affairs turned off his phone and blocked him from updating his phone list. *Id.* He was distressed that he was not able to talk to his family. *Id.* They discussed coping skills and working on his mental health packet. *Id.* Figueroa met with Brier on December 28 for therapy. *Id.* at 5–6. He reported doing better and they discussed many things, including Brier's family; his emotions related to anger, anxiety and depression; environmental factors; and managing distress and symptoms. *Id.* Brier was noted to be attentive and responsive. *Id.*

Ball met with Brier at his cell on January 4, and 8, 2024. *Id.* at 36. Brier denied any mental health concerns or needs. *Id.* Brier submitted an RFHC dated January 9, stating that he was experiencing emotional distress and suicidal thoughts because his phone list was blocked, among other things. Dkt. 78-4 at 54. Ball met with Brier at his cell the day after he submitted the RFHC, and Brier denied any mental health needs or concerns. *Id.* at 36. Dr. McCafferty responded to the RFHC noting that he was already seen. *Id.* at 54

Dr. McCafferty met with Brier on January 11 for therapy. *Id.* at 7–8. Brier repeatedly commented on Dr. McCafferty's appearance and she had to keep redirecting him to talk about his mental health status. *Id.* They discussed his

upcoming transfer, but Dr. McCafferty had to end the session as he kept returning the conversation to her appearance. *Id.* It was unclear to Dr. McCafferty what his goal was in commenting on her appearance. *Id.* Brier submitted an RFHC on January 11, regarding mental health problems and suicidal thoughts. *Id.* at 55. Dr. McCafferty responded to this the same day noting that she saw him that day. *Id.* Lawson also met with Brier during mental health rounds that day, and Brier denied any immediate mental health needs. *Id.* at 36. Ball met with Brier at his cell for his weekly mental health visit on January 17, 22, and 25, 2024. *Id.* at 35–36. Brier denied any mental health needs or concerns. *Id.*

On January 29, when Ms. Ball met with Brier for his mental health, Brier was agitated about the heat being turned up and made a threat of self-harm/suicide, and Ball notified Dr. McCafferty. *Id.* at 35. Dr. McCafferty met with Brier at his cell later that day, and he denied making this statement and told her he would not go on a strip cell status and would assault her if she put him on suicide watch. *Id.* at 9–12. It appeared to Dr. McCafferty that he had made the suicidal statement as an exaggeration within Ball's hearing, but not directly to her. *Id.* Brier was irritable, but Dr. McCafferty did not think he was at genuine risk of suicide. *Id.* Other than his irritability and hostility, his mental health status was within normal limits for him, and Dr. McCafferty did not think it was necessary to place him on suicide watch. *Id.*

Ball met with Brier for his weekly mental health visit on February 5, and Brier denied any mental health needs or concerns. Dkt. 78-4 at 35. Dr.

McCafferty also met with him that day for therapy. Dkt. 78-2 ¶ 32. He complained about waiting for his transfer and having all of his phone numbers blocked. *Id.* She told him she would check into the status of those two things. *Id.* Brier submitted an RFHC Request for Healthcare on February 7, regarding his phone list and was seen the next day. Dkt. 78-4 at 59. Ball met with Brier at his cell the next day, and he reported no mental health needs. *Id.* at 35. Dr. McCafferty also met with Brier that day for therapy. *Id.* at 17–18. He complained about his phone numbers still being blocked and expressed thoughts of assaulting someone to get his transfer faster. Dkt. 78-2 ¶ 33. He appeared to be venting and that he did not actually intend to assault someone. *Id.* In Dr. McCafferty's professional judgment, his suicidal statements appeared to be a result of his anger and behaviorally motivated to get his phone list unblocked rather than a true thought of suicide. *Id.* He presented as angry but did not show actual signs or symptoms of depression. *Id.* Dr. McCafferty thought his overall risk of suicide was low and she did not place him on suicide watch. *Id.*

Ball met with Brier at his cell for his weekly mental health visit on February 12, but Brier was sleeping. Dkt. 78-4 at 35. She met with him again a few days later and he reported that he had no mental health needs or concerns. *Id.* at 34–35. Ball met with Brier at his cell again on February 21. *Id.* at 34. He asked for a roll of toilet paper and she informed custody staff. *Id.* Brier reported actively working on his mental health packet. *Id.* Dr. McCafferty met with Brier the next day for therapy, but he was unwilling to engage with her. *Id.* at 21–22. She reviewed his chart and noted that he had not presented with any signs or

symptoms of psychosis since she started seeing him; so, she resolved his prior diagnosis from 2013 of unspecific psychosis. *Id.* He also had not had any suicidal behavior in the past year, so Dr. McCafferty changed his mental health code to C. *Id.*

Behavioral Health Specialist Amedeo Madrid met with Brier at his cell for a mental health visit on February 28. *Id.* at 34. Brier did not report any immediate mental health concerns. *Id.* Brier transferred to the Westville Correctional Facility that day. Dkt. 78-2 ¶ 35.

**5. Overview**

Dr. McCafferty explains that while he was in segregation, Brier was able to perform his activities of daily living and was proactive in taking care of his physical health. Dkt. 78-2 ¶ 37. Beyond the RFHCs that he submitted about his mental health during this time, he submitted numerous requests for healthcare about various medical issues, including dental issues; his ankle; dizziness; breathing issues; heart problems; stomach pains; asking for testing for Hepatitis and HIV; his diet; his arm; headaches; the flu; blood work; his back; and weight loss. *Id.* He also took regular medication for several physical health issues and interacted with the medical staff regarding his physical health needs. *Id.* Dr. McCafferty explains that this is not indicative of someone who is mentally deteriorating but is a sign of someone who is mentally stable, able to care for himself, and forward thinking. *Id.*

She also explains Brier's allegation that mental health staff was supposed to review his status in segregation every 14 days is incorrect. *Id.* ¶ 38. It was the

job of the mental health staff, mainly Dr. LaMar and Dr. McCafferty, to alert the correctional staff if Brier's mental status deteriorated or was such that it was unsafe for him to remain in restrictive housing. *Id.* Based on the information available to Dr. McCafferty and in her professional judgment, it was never necessary to tell the correction staff that Brier needed to be released from Restrictive Housing due to his mental health status. *Id.*

**D. Conditions**

**1. Pest Control**

IDOC facilities have a Life, Health, and Safety Manual which governs pest control, among other things. Dkt. 84-18 ¶ 61; Dkt. 84-13. Under this policy, facilities have a Safety Hazard Manager, a Certified Operator, and a registered technician who are in charge of pest control. Dkt. 84-18 ¶ 61; Dkt. 84-13 at 25–26. Warden Reagle, Lt. Jackson, and UTM Shaver did not have any of these positions. Dkt. 84-18 ¶ 62. Warden Reagle does not recall Brier's unit having a pest problem during 2023. Dkt. 84-18 ¶¶ 68–69. He also was not aware of any of Brier's grievances. *Id.* ¶¶ 74–76.

**2. Recreation**

When Brier was housed at G Cell House, there was a staff shortage at Pendleton. Dkt. 84-18 ¶ 77. Because of the staff shortage, other matters like medical, food, and showers had to be addressed before recreation. *Id.* ¶ 80. Therefore, recreation was held one day a week for one or two hours at a time. *Id.* ¶ 79. Recreation included all inmates in G Cell House, including Brier. *Id.* ¶ 81. To help run recreation, unit team staff, including UTM Shaver, would take time

away from their other duties. *Id.* ¶¶ 82, 88. Because G Cell House was a restricted unit, to run recreation, several staff members were needed to remove each inmate from his cell in restraints and escort him to where recreation was being run. *Id.* ¶ 83.

Brier testified that he received one hour of recreation a week at G Cell House between March and July 2023 and two or three hours per week between August and October. Dkt. 84-1 at 107–08. There was no recreation from early November through mid-December because of a lockdown. *Id.* at 108–09. He then had as much as three hours per week from mid-December until he left Pendleton in late February 2024. *Id.* at 109.

**3. Cleaning and Food Service**

Pendleton assigned inmate detail workers to assist in cleaning G Cell House. Dkt. 84-18 ¶ 89. But detail workers could not go on ranges without an escort. *Id.* ¶ 90. Considering the staff shortages, they typically assisted most in cleaning the common areas. *Id.* Food from the kitchen would be delivered to the housing units in specialty, insulated carts. *Id.* ¶ 91. Sometimes, carts in G Cell House were pre-cleaned by detail workers. *Id.* ¶ 92. When the specialty food cart arrived in the unit, staff, including Lt. Jackson, would have used a different "flatbed" cart to transport the trays to each cell. *Id.* Because of staffing issues, it is possible that some carts might not have been completely clean. *Id.* ¶ 93. But, because the food served to inmates was on trays, the food would not have made contact with the cart. *Id.*

## III. DISCUSSION

### A. Mental Health Treatment

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

#### 1. Medical Defendants

The medical defendants do not deny that Brier's mental health condition was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Brier's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Brier "must provide evidence that an official actually knew of and

disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

Brier's claims the medical defendants were deliberately indifferent to his need for mental health treatment. Specifically, Brier alleges that he told Drs. Lamar and McCafferty that his danger exception should be reviewed every 14 days. Drs. Lamar and McCafferty argue that they were not responsible for reviewing his danger exception, dkt. 78-2 ¶ 38, and, more importantly, Brier received mental health medication and regular visits from mental health staff. None of the mental health staff members raised any concerns about Brier's condition. Further, Drs. Lamar and McCafferty affirm that, during the time at issue, they did not observe any mental decompensation or any reason for Brier to be released from segregation. *See* dkt. 78-1 ¶¶ 7, 10, 14; *see generally* dkt. 78-2. Brier has not designated admissible evidence to the contrary.

Based on the undisputed evidence, no reasonable jury could not conclude that either Dr. Lamar or Dr. McCafferty were deliberately indifferent to Brier's mental health needs. They are therefore entitled to summary judgment on this claim.

**2. State Defendants**

Lt. Jackson, Warden Reagle, and Unit Team Manager Shaver argue that Brier's condition was not objectively serious because he was being treated by

mental health staff. But a medical condition is deemed to be objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999). Thus, the fact that Brier received regular mental health care could lead a jury to conclude that he needed that care and therefore that his condition was objectively serious.

Even if the Court assumes a serious medical need, Brier cannot show the State Defendants were deliberately indifferent to that need. Indeed, the State Defendants argue that they were not subjectively indifferent to Brier's care because he was receiving professional mental health care. Indeed, the "division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations and citations omitted). Brier has not designated evidence that would allow an inference that the State Defendants had reason not to rely on the care provided to him by the mental health staff. They are therefore entitled to summary judgment on this claim.

**B. Conditions of Confinement[3]**

In support of his conditions-of-confinement claim, Brier contends that he was denied recreation for weeks or months and that Lt. Jackson told him this was due to staff shortages. He also asserts that the food carts are dirty, that Lt. Jackson admitted that they have to use the carts to carry dirty clothes. He also claims that he is not able to clean his cell often enough, leading to infestations and contamination in his cell. However, on the record before the Court, no reasonable jury could conclude that Brier's Eighth Amendment rights were violated.

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v.*

[3] The medical defendants explain that Brier testified at his deposition that Drs. Lamar and McCafferty had no role in the conditions he experienced at Pendleton. Dkt. 84-1 at 112. Any such claim recognized in the screening order is therefore dismissed.

*Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

**1. Pest Control**

First, Brier alleges in his complaint that the G Cell House was unsanitary during his time there. The State Defendants have designated evidence that they were not responsible for sanitation on Brier's unit. Dkt. 84-18 ¶ 62. Notably, Warden Reagle does not recall Brier's unit having a pest problem during 2023. Dkt. 84-18 ¶¶ 68-69. He also was not aware of any of Brier's grievances. *Id.* ¶ 74-76. Accordingly, Brier has failed to designate any evidence from which a reasonable jury could infer deliberate indifference by the State Defendants.

**2. Recreation**

Short-term denials of exercise do not violate the constitution. *See Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (denial of outdoor exercise for 70 days permissible); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (denial of out-of-cell exercise for 28 days permissible); *but see Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (prisoner who was allegedly denied recreation time up to seven weeks, and then was afforded only one hour of recreation every two weeks, stated Eighth Amendment claim).

Because of a staff shortage when Brier was housed at G Cell House, recreation was held one day a week for one or two hours at a time. Dkt. 84-18 ¶ 79, 80. Brier received one hour of recreation per week at G Cell House between March and July 2023 and two or three hours per week between August and

October. Dkt. 84-1 at 108. There was no recreation from early November through mid-December because of a lockdown. *Id.* at 108–09. He then had as much as three hours per week from mid-December until he left Pendleton in late February 2024. *Id.* at 109. Thus, the designated evidence reflects that Brier received regular recreation during most of the time he was in segregation. Although he was denied recreation for several weeks because of a lockdown. All said, no reasonable jury could conclude that the denial of recreation Brier underwent violated his Eighth Amendment rights.

**3. Cleaning and Food Service**

Brier alleged in his complaint that the food served to him was transported on dirty carts. But the state defendants have designated evidence that, even if the carts themselves were dirty, the food was contained on trays and therefore did not touch the carts. Dkt. 86-1 ¶ 4. Thus, there is no designated evidence to allow a jury to conclude that the food served to Brier during the time at issue presented an excessive risk to his health and safety. The defendants are therefore entitled to summary judgment on this issue.

* * *

The State Defendants also argue that they are entitled to qualified immunity on Brier's conditions claims. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Once the defense of qualified immunity is raised, a

defendant is entitled to dismissal unless a plaintiff comes forward with facts showing a constitutional violation and law showing his right was 'clearly established' at the time of the alleged violation." *Thomas v. Carmichael*, 164 F.4th 1058, 1067 (7th Cir. 2026) (quoting *Siddique v. Laliberte*, 972 F.3d 898, 902-03 (7th Cir. 2020)). "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). Here, because Brier has failed to designate evidence that the conditions at issue violated his Eighth Amendment rights, the Court need not address the qualified immunity defense further.

## IV. CONCLUSION

The defendants' motions for summary judgment, dkt. [84], dkt. [78], are **GRANTED**. Judgment consistent with this Order shall now issue by separate entry.

**SO ORDERED.**

Date: 9/24/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

JACOB C. BRIER
228552
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY – Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All electronically registered counsel